**Djalma S. WOLFSON, Plaintiff,**

v.

**LITTON INDUSTRIES, INC., et al., Defendants.**

**No. 69 Civ. 2978.**

United States District Court, S. D. New York.

April 6, 1971.

Stull & Stull, New York City, for plaintiff; Richard J. Stull, New York City, of counsel.

Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for defendants; Harvey D. Myerson, New York City, of counsel.

PALMIERI, District Judge.

Plaintiff, a New York resident, engaged in various projects involving the

development of Guyana, an underdeveloped South American nation, commenced this suit on July 9, 1969, generally alleging fraud, breach of contract, breach of fiduciary obligation, and violation of the Securities Laws by the defendants. Defendants are: Litton Industries, Inc., a Delaware corporation whose stock is traded on the New York Stock Exchange; Litton International Development Corporation, a subsidiary, and Litton Forest Products Ltd., Guyana, a Guyana corporation founded by Litton after the agreements in issue to carry out the proposed projects. Jurisdiction is predicated upon Section 27 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78aa) and upon diversity of citizenship (28 U.S.C. § 1332). Plaintiff moves herein for summary judgment pursuant to Rule 56, F.R.Civ.P., claiming that "there is no genuine issue as to any material fact" and that he "is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). In the alternative plaintiff moves pursuant to Rule 37 to strike defendants' answer for willful failure to comply with discovery orders of the court. Defendants have cross-moved for summary judgment. In making these motions, the parties have stipulated that the court may consider the deposition of Philip S. Lyddon, Esq., attorney for Litton Industries.

It will not be necessary for the court to rule upon discovery issues presented. The record shows that both parties have been afforded ample and sweeping discovery, and that the case can be appropriately disposed of by summary judgment. There is no genuine issue as to any material fact and judgment is granted to defendants for the reasons hereinafter stated.

Plaintiff's claims are essentially these: After experimenting with a plan to produce wood pulp from the tropical hardwoods of Guyana, he sought financing for the construction of a projected pulp mill on lands leased by him from the government of Guyana. To this end he entered into an agreement on November 22, 1968, with Litton International Development Corporation. That agreement, which was extended on January 10, 1969, is the subject of this litigation. Plaintiff claims that these agreements created a joint venture between the parties and that pursuant to these contracts, Litton committed itself to: (1) create a new corporation to pursue the construction of a pulp mill in Guyana on Wolfson's lands, (2) issue 20% of the shares of this corporation to Wolfson, and (3) arrange financing not to exceed $30,000,000, $6,000,000 of which was to be provided by Litton itself. Plaintiff claims that defendants violated this agreement and sought to appropriate plaintiff's interests and rights in the venture by exploiting plaintiff's trade secrets, hiring away plaintiff's key personnel and leasing other lands in Guyana, offering plaintiff no part in this independent venture. Plaintiff claims that by virtue of defendants' misconduct, he has been damaged in an unspecified amount and demands an accounting for the purpose of assessing these damages. He further demands that defendants be compelled to deliver up to him all rights and interest in Guyanese lands and that defendants be compelled to specifically perform the joint venture.

Litton contends in answer that the applicable agreements were only preliminary agreements sanctioning independent studies by Litton to determine the feasibility of the project plaintiff had outlined. They argue that no joint venture arose out of these agreements and that they were perfectly free to pursue an independent project after abandoning Wolfson's lands. Moreover, they claim, Wolfson's demands are mooted by Litton's withdrawal from all Guyanese lands and its failure to profit in any way from the project.

In spite of the massive collection of documents in this case, the two agreements in issue are dispositive and unambiguous.

In the agreement dated November 22, 1968, the contingency of the project is clearly expressed:

> Representatives of Litton International Development Corporation have indicated to you an interest in exploring further association with you aimed at the ultimate implementation of the project outlined above. However, it is apparent that a great many facets of the program need to be checked out in greater detail. . . . In our view it will require a minimum of five months for Litton personnel to investigate all such factors.

(Agreement of November 22, 1968.)

In that agreement Wolfson agreed that Litton would have until April 30, 1969, to evaluate the project and that Litton would pay Wolfson $10,000 in consideration of the execution of the agreement. There is no dispute that that sum was paid. It was agreed that *"in the event that Litton determines to move forward . . . the parties will enter into a definitive agreement. . . ."* Ibid, p. 3. (Emphasis supplied).

That contemplated agreement was to provide for the stock allocation that Wolfson seeks to enforce herein. However, it is clearly stated in the preliminary agreement that "it is understood and agreed by Wolfson that unless and until the parties enter into a definitive agreement, there is absolutely no obligation on the part of Litton with respect to Wolfson or the project other than the payment called for in paragraph (D) on page 3 hereof."

On January 10, 1969, the parties entered into an "extension" and "expansion" of that agreement. The April 30 deadline was extended to June 20, 1969. Wolfson agreed to assign to Litton his rights under his Guyana lease "and any extensions and additions thereto. . . ." Sworn affidavits by C. Gordon Murphy, ex-president of Litton International Development Corporation and Philip S. Lyddon, secretary of Litton Business Systems, Inc., state that this reference was meant to apply to properties contiguous to Wolfson's lands, for which Wolfson was negotiating with the Guyanese government. The January 10 agreement provided that if Litton decided, prior to June 20, 1969, to continue with the agreement, it would retain the property. However, if Litton notified Wolfson prior to that date that it did not wish to continue, the rights in the property would revert back to Wolfson. Again, the contingent nature of the project was stressed by the following language—*"If Litton elects to proceed,"* (agreement of June 10, 1969, p. 2) (emphasis supplied), followed by provisions of a proposed final agreement. Consideration for Wolfson's execution of this agreement and his assignment of his lease was fixed at $15,000. This amount was paid in full.

On March 12, 1969, well before the June 20 deadline, Litton informed Wolfson that it did not intend to proceed with the project. This decision was made after receipt of a report on the feasibility of the project which noted:

> The proposed mill site is not suitable. There is no Essequibo concession. The Mazaruni concession, for our purposes, is considered a 4th rate area, considering timber stands and the extreme transport problems to any suitable mill site. (Report by Aero Service to Litton, March 11, 1969).

On May 29, 1969, following their withdrawal from Wolfson's lands, Litton entered into a lease for other lands in Guyana, with the Conservator of Forests of Guyana. After extensive studies Litton decided to withdraw from all Guyanese lands, and it terminated all projects therein, incurring a net loss of $550,000. (Affidavit of Harry Gray, Senior Vice-President of Litton, January 25, 1971).

■ Plaintiff complains of defendants' pursuit of an independent project in Guyana, and his legal argument is grounded in the theory of joint venture. Litton claims that it was perfectly free to pursue its self interest in Guyana,

and this court agrees. *Cf.,* Republic Systems and Programming, Inc. v. Computer Assistance, Inc., 440 F.2d 996 (2d Cir., 1971). The cited agreements expressly note that the venture was a contingent one, and no legal authority supports a claim of joint venture. None of the requirements generally held necessary to the existence of a joint venture—such as sharing of profits and losses and mutual authority to act for one another—are present in this instance. See Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687 (S.D.N.Y.1962), aff'd in part, 317 F.2d 339 (2d Cir. 1963), cert. denied, 375 U. S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110; United States v. Standard Oil Co. of California, 155 F.Supp. 121 (S.D.N.Y. 1957), aff'd, 270 F.2d 50 (2nd Cir. 1959).

■ Having failed to establish a joint venture, plaintiff cannot maintain his other claims. The fiduciary obligations espoused in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, and its progeny can only come into play after a fiduciary relationship has been proved. There is no evidence that defendants stole plaintiff's trade secrets or spirited away his employees. In fact, when plaintiff was asked to specify what trade secrets were involved, he objected to the question as harassing and oppressive. (Interrogatories to Plaintiff, July 6, 1970, Nos. 11, 12). As to defendants' relationship with Joseph Patterson, it appears to have been perfectly proper. Patterson was to serve Wolfson and Litton so long as the project continued and share any confidential information of Litton with Wolfson. (Letter of C. Gordon Murphy to Patterson, January 3, 1969, Exhibit 6 to Plaintiff's Motion for Summary Judgment). Significantly, Litton discontinued Patterson's services "since we are no longer interested in Wolfson's leases." (Letter from Aikman to Patterson, March 17, 1969).

■ Plaintiff's final claim, that defendants have defrauded him in violation of § 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 of the Securities and Exchange Commission (17 C.F.R. 240.10b–5) is totally groundless, since this rule applies "in connection with the purchase and sale of any securities." Plaintiff is neither a purchaser nor a seller within the purview of the rule. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

■ Moreover, and significantly, even if a relationship of co-venture could be assumed, it would be mooted by defendants' withdrawal from the project at a loss of $550,000. Indeed, this possibility was recognized by all parties on July 14, 1970, when the court denied a previous motion for summary judgment pending further discovery and pending the outcome of defendants' activities in Guyana. It appears to the court that to grant plaintiff a judgment for specific performance would be to hold him a joint venturer liable for 20% of defendants' losses. (See United States v. Standard Oil Co. of California, *supra,* and Backus Plywood Corp. v. Commercial Decal Inc., *supra,* both of which deem the sharing of losses to be an essential feature of a joint venture). This is a result the plaintiff plainly does not seek.

In view of this court's decision to grant summary judgment to the defendants, it is unnecessary to rule on plaintiff's motion for discovery. However, it is noted for the record that plaintiff has been given an extensive opportunity to explore defendants' records and interrogate defendants' witnesses. Discovery in this case has been more than adequate and it indicates that there is no material issue of fact to be tried and that summary judgment may be awarded as a matter of law.

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted. It is so ordered.